PEOPLE ex rel. MURPHY v. WALDO, Police Com'r.　(No. 5917.)

(Supreme Court, Appellate Division, First Department.　June 5, 1914.)

MUNICIPAL CORPORATIONS (§ 185*)—POLICE OFFICERS—DISMISSAL—GROUNDS—
　　REVIEW.
　　　Where a police officer did not know that a fellow officer acting with
　　him had received money from a private citizen to aid in securing the
　　arrest of an alleged offender until informed by the fellow officer, and he
　　had no reason to suspect that the fellow officer had not obtained from the
　　police commissioner permission to receive the money for the purpose, the
　　officer, failing to inform his superior of the receipt by the fellow officer
　　of the money, did not violate a rule of the department providing that
　　without express permission of the police commissioner, members of the
　　police force are forbidden from receiving money from citizens or others,
　　and his dismissal on that ground was erroneous.
　　　[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
　　492–509; Dec. Dig. § 185.*]

Certiorari by the People, on the relation of Philip J. Murphy, against Rhinelander Waldo, as Police Commissioner of the City of New York. Writ sustained, and proceedings annulled and relator reinstated.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Isidore Cohen, of New York City, for relator.
Terence Farley, of New York City (Leon N. Futter, of New York City, on the brief), for respondent.

LAUGHLIN, J. The charge which the relator was required to answer, and upon which he was tried and dismissed, was "Conduct to the prejudice of good order and discipline," and the specifications thereof were that, knowing that patrolman William Cohen received $100 from one Epstein, a complainant in a criminal investigation which Cohen and relator were conducting, failed "to report same to proper authorities." The relator pleaded not guilty, and was tried before Third Deputy Commissioner Walsh, before whom Cohen had been tried on a charge based on his having received the money. The testimony taken on Cohen's trial was stipulated into this case, so far as applicable, without calling the witnesses.

Cohen and the relator had been detailed to the Seventh precinct for detective work and assigned to the investigation of crimes relating to the poisoning of horses and to extortion in connection therewith. They had been most successful, and had secured the arrest and convic-

tion of several of the leaders in the commission of such crimes; and their work was highly commended by Second Deputy Commissioner Dougherty, who testified that he personally investigated the conditions with which they were dealing where horse poisoning was rampant and their work, and that "they rendered the very best service," and that he was "more than pleased with the intelligent way both men had done their work on the Epstein complaint." On the 13th of June, 1912, said Epstein, who kept a livery stable and boarded horses at 238 Cherry street, on the lower East Side in the borough of Manhattan, New York, complained to the police that one of the horses in his stable had been poisoned, and that the poisoning of others had been threatened, and Cohen and the relator were assigned to the case. Prior to August 25th that year Epstein lost three more horses through poisoning, and then, evidently owing to the efforts of the detectives to locate the criminals and to the arrest by them of one Levine, the poisoning ceased. Epstein appears to have assumed that Cohen had principal charge of the case, for he called at the precinct station nearly every day, and interviewed Cohen with respect to the progress of the investigation. One Moe Levison, known as "John L.," was indicted, and the detectives were endeavoring to arrest him for attempting to extort money under a threat to poison more of Epstein's horses. On the evening of August 31st Epstein called on Cohen at the station house, and Cohen informed him that a Miss Glick, with whom he had just been talking over the telephone, "had a young man who wants a hundred dollars" for telling the detectives where to find "John L." Epstein had information to the effect that more horses would be poisoned soon, and felt keenly the loss he had sustained, and dreaded the consequences to him and to those dependent upon him of further loss. He at once offered to put up the money, but Cohen assured him that it would not be necessary, and that they would soon succeed in making the arrest. Epstein repeatedly urged Cohen to take the money, and stated that he would be willing to give three times the amount to secure the arrest at once, and felt the matter so keenly that he cried. Finally Cohen suggested that perhaps he could arrange to accomplish the desired result by having Miss Glick merely show the money to the "young man" known as Red Calahan, and Epstein waited at the station house while he went to interview her. Within an hour Epstein was given a telephone message to meet Cohen at the Bowery and Grand street. It is to be inferred that Cohen asked to have the relator join him there also, for another detective accompanied Epstein until they met the relator, who then went with Epstein to join Cohen. They found Cohen and Miss Glick awaiting them. Cohen called Epstein aside, and said that Miss Glick would do as desired, and asked Epstein for the $100. Epstein handed it to him and went home. The plan did not succeed, and the next morning Cohen telephoned for Epstein to come to the station, and he explained the failure and gave back the money. About two weeks later, Epstein was summoned to the station by telephone, and Cohen informed him that Miss Glick claimed she could have "John L." located for $200. Epstein said he would like to see her, and they went to her residence to interview her. Cohen advised on the way that not more than $100 be offered. They saw her, and she manifest-

ed a desire to help Cohen, and·said she would "go over and see the fellow and try to get him to.take the hundred dollars." Epstein had only $90, which he gave to Cohen, and the latter said he would put up the other ten "in case we have to show him the money." The next morning, Epstein went to the station pursuant to Cohen's request by telephone, and Cohen stated to him that they had been out until nearly 1 o'clock that morning, but were unable to "locate·the fellow," and gave him back the $90.

It is manifest that Epstein had entire confidence in Cohen, and considered the transaction perfectly legitimate. His understanding was that the money was to be shown, but not delivered, and was to be returned to him in any event; and it was so returned promptly. There is no evidence that would even warrant a suspicion that the relator had any reason to believe that Cohen was not acting in the utmost good faith, and Epstein at no time found fault with the conduct of either of them. The record indicates that the fact that Epstein so delivered the money to Cohen was brought to the attention of Second Deputy Commissioner Dougherty on September 27, 1912, by a letter from one Dr. Magnus, which the trial commissioner excluded, and that the information on which it was based came from Epstein, who, however, did not intend to reflect on the conduct of either Cohen or the relator. Dougherty then summoned Cohen and the relator, and directed them to separate and to prepare separate reports of their entire proceedings under their assignment on the complaint made in June by Epstein, and each of them made a report in writing. The report made by the relator appears to be, and Dougherty considered it, a full and frank report. The relator testified that he did not suppose that the receipt of the money by Cohen fell within the prohibition of rule 50, and that if he had, he would have reported the fact when it came to his knowledge. There is no evidence that relator violated any rule of the department, or failed to perform any duty which devolved upon him. The only rule of the department having any bearing on the subject is rule 50, which is not set forth in hæc verba, but its contents are stated in the record as follows:

"This rule provides that, without express permission of the police commissioner, members of the police force are forbidden to make presents, bestow testimonials, collect or receive money, or anything else from citizens or others, circulate subscription papers or books, or, sell tickets for any purpose."

That rule does not apply to any act performed by the relator, and it did not require that he obtain permission from the police commissioner for any act performed by him, either separately or in co-operation with Cohen, in investigating the·charge made by Epstein and endeavoring to apprehend those guilty of the crimes of poisoning horses or extortion by threatening to poison unless they received money. We refrain from expressing an opinion with respect to the applicability of the rule to Cohen; but it is perfectly plain that it did not apply to the relator. If that rule forbade the taking of the money by Cohen for the purposes stated without the permission of the police commissioner, it was incumbent upon Cohen, and not upon the relator, to obtain such permission. ·It now appears that Cohen did not have permission of

the police commissioner to take the money, but there is no evidence showing, or tending to show, that the relator was aware of that fact, or that the relator was in any manner responsible for Cohen's having received the money without obtaining such permission. The relator's statement that he did not think that Cohen violated any rule, and that if he had thought so he would have reported it, is not to be construed as indicating that he knew that the relator did not have such permission. It appears that Cohen received the money the first time without the knowledge of the relator, but informed the relator right after receiving it; and the relator knew nothing of its receipt the second time. If the relator knew the circumstances under which Cohen received the money, he would have no reason to suspect that Cohen did not obtain from the police commissioner permission, if such permission was required by the rules, for the transactions between Cohen and Epstein appear to have been open and above board, and in the main they were had at the station house, where, doubtless, such permission could have been obtained readily if required.

If the action of the police commissioner in discharging this relator should be sustained on the evidence in this record, it would be a dangerous precedent, for it would open the door to the removal of members of the force on trivial charges, not only without the violation of any law, but without the infraction of any rule made for their guidance. If the relator is subject to removal for not having reported to his superior officer the fact that Cohen informed him of the receipt of this money, for which Cohen may have had permission from the police commissioner if that was required, then no officer would be secure in his position without reporting everything that he knows about a fellow officer, notwithstanding the fact that no rule requires it. Without any law or rule requiring it, an officer would thus be subjected to liability for dismissal for failure to report any conduct on the part of a fellow officer that might be regarded by his superior officer as prejudicial to the good order and discipline of the force. It is neither required by the Constitution nor by any statutory law that one police officer shall report to his superior with respect to the conduct of a fellow officer, which would be proper if authorized by the head of the department; and, if it be deemed that the good order and discipline of the force requires such reports, the members of the force should be notified by an appropriate rule so that they may know that it is required. The relator was appointed on the 1st of March, 1907, and this is the first charge ever made against him. The evidence is wholly insufficient to sustain the charge, and utterly fails to show the slightest evidence of conduct on the part of the relator that in any reasonable construction can be held to be prejudicial to good order and discipline.

It follows, therefore, that the writ of certiorari should be sustained and the proceedings annulled, and the relator reinstated, with $50 costs and disbursements. All concur.